If it please the court, I'd like to address the issues regarding the multiplicity of the charges in the amended trial indictment, as well as the issue regarding the insufficiency of the evidence. We submit that the counts 1 through 4 and counts 6 through 9 and 11 through 13 are multiplicities. They rely on the submission of an application to either Bank of America or to Wells Fargo Bank on the applications for four business lines of credit. May I ask you, sorry to interrupt your train of thought here, but if we agree with you, which counts would remain? Which ones would survive? On the multiplicity, I believe that only the, well, our position is that because of the insufficiency of the evidence, none of the. I'm talking about the multiplicity. Let's focus on multiplicity. So we believe that only the count 5 and count 10, which are the submissions of the applications of ANA development. No, excuse me, of California podiatry and diabetes, diabetes foot and howling moon, Inc. Let's, let's assume just for the sake of discussion, we, we agree with you about that, but not about the sufficiency of the evidence. So that counts, the other counts get tossed out, counts 5 and 10 remain. Okay. Let's just assume for the sake of our discussion. What then we, we, we remand for resentencing and would it, would it, would it make any difference in the sentence? It may. Of course, there is law that indicates that if one is sentenced to concurrent sentences, remand would not be appropriate. However, there is the Supreme Court has spoken in 2013, indicating that if a defendant has been assessed financially by the court, it no longer is considered concurrent sentences. And Mr. Charles was assessed a hundred dollars per count, $1,400. So it would be appropriate to remand, strike the multiplicities counts and resentence him. And would he actually have to go before the judge or could the judge just do out of paperwork kind of thing, canceling the hundred dollar assessments? I mean, what I'm getting at is, does it have to be a whole full plenary resentencing or can the judge just say the sentences are affirmed? I'm striking the, the financial assessments on the, on the stricken counts. Well, the sentence would actually be set aside. So there would be a new sentencing hearing. And Mr. Charles would in fact, my understanding from what I've read, be required to be present. Well, some convictions would be set aside, but there would still be some, as you suggest, five and 10, for example, would remain. Oh, that's correct, Your Honor. If the court affirmed those two. And with respect to five and 10, does the government have a chance to determine whether it wants to proceed on five or one of the one through four or one of the six through nine through 13? I think that we're instructed by several seminal cases, which have been cited by both the government and the appellant in our briefs. If the counts indicating the deposit of funds into the various banks, under the theory of aiding and abetting, one has to determine that Mr. Charles actually was an aider in abetting, an abetter to counts five and counts 10. So if he were not, then of course counts one through four and the remainder counts of depositing would not be acts of execution and the government would not have that election. So our position is that the courts have announced in order to be acts of execution, each act as charged in the indictment must be chronologically and substantively independent and not dependent on other acts of execution. Well, what's the scheme here? The overarching scheme in this particular case is to obtain funds. It's similar to what the scheme was in U.S. versus Anderson. In that case, the scheme was to obtain funds that were going to be deposited and were deposited into an E.F. Hutton bank account in order to purchase four sub-zero coupon bonds, which would be the security for loans issued by the bank for which— Well, arguably that would be consistent with a scheme every time there's a check drawn on the line of credit. Why isn't each check a separate scheme? In that particular— If the whole idea is just to get money. Are we talking about the Anderson case? No, I'm talking about your approach to what is a scheme versus what is execution. Well, it's very similar to the scheme that exists in Anderson, and the court was very clear indicating that the scheme was to obtain the money. Once the money was in the bank, the scheme had been completed. Thereafter, it made no difference if the monies would be transferred to another bank, to grocery stores, to other people. The disbursements thereafter were not acts in execution because they actually occurred after the completion of the scheme itself. We analogize this to one scheme in order to get the funds. Once those applications were submitted, approved, and the lines of credit had been funded, we have testimony from Mr. Henderson that on the approval and funding of all of these lines of credit, the checkbook would immediately be delivered to Avery, who would write checks. Therefore, our position is that we don't have any further acts of execution after the funding of each application's line of credit. That would be the theory on which we present to this court that the counts that I have indicated are multiplicitous because they are dependent on the funding of the applications in this case. Taking the evidence in the light most favorable to the government, what did your guide do as far as this goes? When we look at the testimony, we have firsthand testimony from Mr. Henderson and Dedrick Johnson. Dedrick Johnson had an intimate relationship with Ms. Avery over a two-and-a-half-year period of time. Mr. Henderson, he had a personal day-to-day relationship with Ms. Avery, who was deemed to be the spearhead, the leader of various applications for business lines of credit. Those testimonies indicated that Mr. Charles was not involved in either developing profiles from identity thefts, submitting applications to banks for ANA development. What did he do? He received checks. And deposited them? He received and deposited checks. However, the receipt and the deposit of checks are not indicative of having done anything as an aider and abetter to objectively show that he assisted in making sure that the various applications would be approved. So when we look at the overall testimony, Henderson indicated that the California Podiatry of Diabetes Foot was his and Avery's project. He also indicated the same for Howling Moon, Inc. Dedrick, he indicated that he and Avery were the persons who created and presented the applications for lithium and for ANA development. They have never mentioned the name of Mr. Charles in those four lines of credit. Those are the four lines of credits on which the 13 counts under the amended trial indictment occurred. It's interesting also to note that the government did not charge Mr. Charles in submission of applications or submitting false information to banks for any of those four lines of credit. No, but his role in this apparently was once these bogus accounts were open, he would get the checks that were drawn on them and then deposit them for what's basically ill-gotten gain. Isn't that what their theory is? He was, according to the testimony, there was representation that he was a consultant, a business consultant. And we had that information from the testimony of his landlord and from the... Whatever his title was, that's what he did, right? He got these checks that were drawn on the fraudulently opened credit lines, he obtained the checks, and then he funneled the money elsewhere. That's correct. Well, why isn't that sufficient evidence? Well, I don't know that he funneled it elsewhere. Well, placed it other... It went into his account. Yeah, thanks to him. I mean, he did it. He put the money in the account. Well, it was withdrawn by Avery. And he went to the bank and put the money... That's correct. Okay, now why... But into an account that he controlled. That's absolutely correct. However, the money was controlled before he received the check. And once the money was under the control of Avery, the schemes that she had created had been completed. So it would make no difference that he obtained money thereafter that he controlled if it were not an act of execution, and we submit that it was not an act of execution. I also would like to indicate, relating to the question whether or not Mr. Charles would be eligible to be resentenced, we had presented the issue on ex post facto. And the ex post facto law is such that regardless of the discretion that the trial court did exercise in assessing a point, a sixth level for the base offense level, it was a violation of the ex post facto law because the later 2004 guideline prejudiced him because it increased the base offense level. So under the violation of an ex post facto provision, he would be eligible... Well, the sentence should be set aside in total, and he should be remanded for further proceedings, which would either be another plea agreement or whatever would be worked out at that time. I would like to... What would the difference be between the 2002 and 2004 guidelines? On the low end, it was 8, I believe. On the high end, it was 10. This is the level you're talking about? Oh, yes, that was the level. I can tell you, Your Honor, I have it, if you don't mind. I think it was a two-level difference. The difference would be a range of, on the 2004 guidelines, a range of 78 to 97, and on the 2002, a range would be 70 to 87 months. 70 to 87? 70 to 87 months. So that would make the low end variance 8 months and the high end variance 10. And I would like to reserve... You may do so, counsel. Thank you. Good morning. I may please the court. Ryan White from the United States, also present at council table, is Lena Morten Owens, my trial partner, below, down in the district court. With the court's permission, I'd like to first address defendant's multiplicity argument. And Judge O'Scanlan, to respond to your question, what is the scheme here? With regard to counts 1 to 13, except for counts 5 and 10, which are application, each of these counts charges a withdrawal on a line of credit. And this case is charged as Title 18 U.S.C. Section 1344, subsection 2, execution of a scheme to obtain the money or property of a financial institution by means of false or fraudulent pretenses. By its very definition, the scheme is defined as obtaining the money or property of a financial institution. Which means each check, is that what you're saying? That's correct. Why isn't the scheme the fraudulent acquisition of the line of credit? That is one part of the scheme. But because 1344, subsection 2, as opposed to subsection 1, the object of that scheme is to obtain the money or property, certainly the first act of applying for the loan to induce the bank to issue the line of credit would be part and parcel of the scheme. As would be the obtaining of the property under that specific subsection of Section 1344. The Tenth Circuit in Berger concluded that each withdrawal in a line of credit is an independent execution of the scheme. We have testimony here regarding these lines of credit. That testimony is from Richard Reynolds, Bank of America employee, between GER 157 to 182, where he explained that what's unique about lines of credit, as opposed to, say, for example, a mortgage, is that once the line of credit is applied for, the bank makes the funds available to the guarantor or to the recipient of the line of credit. But that money, while available to the guarantor, is not obtained by the guarantor until a check or a withdrawal is made off of the line of credit. Let me ask you a question. Suppose a guy goes into a bank and robs the bank, gets a bag of money, and they go to the safe house and they divide up the money. Is that one crime or more than one crime? That, Your Honor, although perhaps not bank fraud, would likely be one crime. What's unique here, and what is distinguishable from cases that the defendant has cited, like Kilkenny, where the Second Circuit was concerned about once a loan is issued, it would extend the statute of limitations indefinitely to charge independent executions for failure to repay the loan. That is different than what we have here, where the money is made available, but the bank is not divested of its funds, and the guarantor is not obligated to repay those funds if and until the guarantor withdraws money. I think the way I conceptualize it, because I've gone back and forth, initially looking at this case, I thought there's only four separate counts here, because there's four lines of credit. But then I got to thinking about the nature of a line of credit, since I'm familiar with that, and you could open a line of credit and never use it. So if they had just opened the line of credit, could you have prosecuted them under this statute? Yes, we could have prosecuted them. Just for opening it, under this statute? Yes. Then that undercuts what I'm thinking, because under this statute, oh, it would come under Section 1. Could you prosecute them under Section 2, because they wouldn't have obtained any funds yet? It would be prosecutable under both Section 1 and Section 2, Your Honor. Explain that to me. Because under Subsection 2, what we're talking about is a scheme here, and it is a scheme to obtain the property of a financial institution. But what if they never draw on the line of credit? By means of false and fraudulent pretenses is the end of what I was going to say. So maybe it's correct to look at the separate line of credit rather than each of the executions, because even though it's a line of credit, just the very fact that you've done that, you already are chargeable with this crime. So it's redundant to then charge for every check that's written or received. I disagree, Your Honor. And the reason is because while it may be chargeable at the moment at which an application is made bearing false or fraudulent pretenses that are material, which the defendant knew about, it is not complete at that point. It is complete by nature of the language in Section 1344, Subsection 2, when the defendant obtains the property. And specifically with regard to lines of credit, the defendant does not obtain the property until the money is withdrawn. That seems to me to cut against you, though. It seems like there are several steps in the scheme, and it's ultimately one scheme per account rather than each check being a separate charge. It seems like the scheme is to steal money from the bank using a fake line of credit, and part of it is opening the account, part of it is drawing it out. And I'm not clear why we shouldn't view that as one kind of holistic effort instead of piecing it out step by step. I do think, Your Honor, it is correct that it is one holistic effort and that it is all the scheme. It is all the scheme to obtain the money or property of the bank. I think with regard to what is an execution, the Seventh Circuit has explained, I believe it's in Longfellow, that it's a multi-factor test. You look at the ultimate goal of the scheme. That is the first of the tests. But then counsel brings us to Anderson, which says this case, Anderson is significantly different from, in effect, Longfellow, and points out that the real test is whether the bank is placed at additional risk. Well, the bank is placed at risk by granting the line of credit. True. A single check could have been drawn for the entire line on day one. So what's the difference between ten checks being drawn over ten weeks for the same maximum total? I think if we were talking about a traditional loan like a mortgage where the bank authorizes a lump sum of money, that money is transferred out of the bank, that the scheme would be complete then and we would not be able to charge, for example, failure to repay the loan or failure to pay interest on the loan. But where it's a line of credit and where we have testimony in the record from Mr. Reynolds regarding how the lines of credit work, that the guarantor is not obligated to repay the bank if and until the money is withdrawn. That means that the defendants have not actually obtained anything from the bank until they take the money out. So while the bank is placed at a risk upon the initial loan application, the bank is placed at an additional risk every time money is withdrawn specifically from a line of credit. And I also don't think risk of loss, while I think it is one factor to look at, this court is very clear in the Appellee Name Case Risk, R-I-Z-K, as well as Shaw. Those are not cited. But if we're talking about risk of loss, this court has repeatedly held that the Ninth Circuit has never imported a risk of loss analysis into 1344-1 or 1344-2. I do think that it is one pertinent factor in determining whether there are independent executions of the scheme. I think another factor is looking at the overall goal of the scheme. That reference you make to this risk of loss in the Ninth Circuit, that's not a holding of a case, is it? In other words, that doesn't bar us from, let's say, following the Seventh Circuit in Anderson. No, it's not a holding of a case. The way I read the cases, they have said, essentially, this court has never adopted a risk of loss analysis, even assuming, let's assume there was, we've met it, let's assume there wasn't, the case is affirmed. So it wouldn't preclude the court from holding, I don't believe. All right, let's get to the sentencing issue. To put aside the 2002-2004 differential, if we were to agree with opposing counsel that there is a multiplicity and there are really only two counts, what does that do to the sentence? Does that change the sentence in any way? I mean, apart from the $100 per count. Sure. As a matter of guidelines interpretation, I do not believe it does because the guidelines are based on the scheme. The district court made its findings by both the preponderance and clear and convincing evidence based on the scheme and the evidence before the district court. Loss was the driving factor. The loss would not change. The guidelines would remain the same. With regard to this court's unbundling precedent, I don't have the cases at the top of my head. I'd be happy to file a letter with the court citing those. I believe that if the court were to reverse on certain counts based on the multiplicity issue, it would have to remand for resentencing and the district court would resentence the defendant with the defendant appearing personally. I believe that's correct. With the right guidelines. Now, that gets to the second point, if I may, Your Honor. The right guidelines were used. If the court takes a look at GER 1092, 1092, it is very clear the district court calculated a base offense level of 6 using the 2001 guidelines. And there's an explanation or a brief and a footnote for why those guidelines were used. The only difference between the 2001 and 2002 guidelines on one hand and the 2004 guidelines on the other hand is that the base offense level was 6 in the 2001 and 2002 guidelines and was either a 6 or a 7 in the 2004 guidelines. And that depends on the statutory maximum penalty for the offense of conviction. Here, the district court did not use the base offense level of 7 that was contained in the 2004 guidelines. The district court used the base offense level of 6 that was contained in the 2001 and 2002 guidelines which were enforced on the date of his offense and therefore would pose no ex post facto violation. It's very clear at that record site that there simply is no ex post facto violation here. The guidelines, to answer the court's question, under the 2004 guidelines it would have been an offense level of 27 before the district court used his discretion to depart downward by two offense levels. That's a 70 to 87. Under the 2001 and 2002 guidelines, it would have been 63 to 78 months under a 26. But regardless, what the district court used here was the 2001 guidelines. Calculated a base offense level of 6 and then calculated the enhancements and there is no difference if the court looks at the enhancements across the different guidelines. There's no difference in any of the enhancements. Did the judge actually use the 2001 or whatever he was using he happened to do it in accordance with 2001? The judge stated in response to my colleague's recitation of what the ultimate guidelines calculation are, that a base offense level of 6 using the 2001 guidelines. Is that correct, Your Honor? Yes. It's abundantly clear that that is what the court used. So while there may be some theoretical difference between the 2004 and the 2001 or 2002 guidelines, it's simply not an issue here because the court used the guidelines in effect on the date of the offense of conviction. So there is no ex post facto violation. Going back to counsel's point that only counts 5 and 10 would survive, is the court, if we were to agree with counsel, is the court free to re-sentence on 5 and 10 or not? Yes, the court is free to. And the reason, and this gets me to my next point, if the court will indulge me, I know I only have 2 minutes, I see the yellow light, sufficiency of the evidence. Judge Silverman, you asked what did your guy do? And the response was he received checks. True. And he did a lot more. And the reason is because if the evidence were insufficient, well, then there would be no re-sentencing, correct? Because the court would be remanding, or not remanding because the court would be reversing the conviction. But the evidence is sufficient on all counts, and certainly on counts 5 and 10. I would first point out that this court's precedent is very clear in Blitz and Lothian and Bernadelle, that as long as the government proves that there's a scheme to defraud, that the defendant was a knowing member of the scheme, had the intent to defraud, he is liable for acts, reasonably perceivable acts committed by co-schemers. That's the overlay of the issue that we have here. But there is a lot more than that in this case. Defendant focuses a lot on Larry Henderson, the government's cooperator. What did he do? Tell us in 25 words or less what he did. For example, Quinn Westbrook, Bank of America employee at GER 272 to 305, testified that he submitted five or six typed applications to her, as well as supplemental documentation. At least one or two of those, De La Style and North Point Property Management, were confirmed to contain identity theft victim information and all sorts of falsities all over the applications. He arranged for a site inspection for California Podiatry of Diabetes Foot. Those are counts five to nine. He went on site inspection for North Point Property Management and De La Style. And here we're talking about all fraudulently obtained loans. He gave Ms. Westbrook the impression that he represented these identity theft victims who were the quote-unquote guarantors on the lines of credit. That would be Paul Urea, who was a doctor who testified at trial. He was a guarantor on the California Podiatry line. He said he didn't know the defendant. He had nothing to do with this. Catherine Nemeth, she was deceased at the time. Yet the defendant faxed her number to Ms. Westbrook and told Ms. Westbrook that he represented this woman. In addition to that, the defendant received... That's just some of the content. So how did Ms. Westbrook ever wake up and understand? I mean, how could she be repeatedly duped into these fraudulent lines of credit? Eventually she was charmed by him, and eventually she did learn and suffered some consequences for it at the bank. But this scheme was sophisticated. As Larry Henderson testified, you had to use a guarantor with a credit score of over 720. You had to have an actual business. These businesses certified by the state of Nevada. They set up fictitious sites and put banners on the door and put people there to pretend that these were real operational businesses. So she was duped by Mr. Charles, and then we get to the benefits he received. Thank you, counsel. Your time has expired. Thank you, Your Honor. Ms. Fusilier, you have some reserve time. Thank you very much, Your Honor. Thank you. I'd like to just clear up some of the information that the government has cited regarding what Mr. Charles did. He indicates that he arranged for a site for the California Podiatry and Diabetes book. He did not do that. He made a phone call, and he indicated something to the effect about an inspection. He did not attend the inspection. He was not present during the inspection. He had nothing to do with the inspection. Does that really matter? I mean, if he's involved in setting it up, it's all part... He didn't set it up. But whatever it is you say he did, that's his part in the scheme, isn't it? No, I don't think so, because the testimony from the government's witness who worked at the bank indicated that no application would ever be approved without a site. That's part of the bank's protocol. They have to have a site. So a question about what they would have done anyway is not setting it up. So what did your guy do with respect to the site? Did he make a phone call? I'm not... I don't understand. He says he helped arrange these site visits. He didn't. Okay, well, what did he do, if anything? He didn't do... First of all, I think that the government is citing something, in the context of a conspiracy. This is not a conspiracy, but aiding and abetting. So Mr. Charles, if he had independent illegal transactions going on and was not involved with what Avery was doing in illegal activities, it cannot be... There is insufficient evidence to show that he was aiding and abetting what Avery was doing, because if he wasn't in contact with her, which Henderson and Dedrick both testified to, who were in contact every day, he could not have been involved as an aider and abetter. The DALA style, which the government refers to, that is handled in Count 16 against Mr. Charles as providing untruthful or false information to the bank. So that has been independently treated. The government also indicates that each check would be an execution, an act of execution. But if we look at Longfellow, Longfellow actually took into consideration that when the government charged Longfellow in the indictment, it started out as a 30-count indictment and the government charged each step in the scheme as an independent count. And the appellate court indicated, you can't do that, because by doing that, that really is transferring the statute of mail fraud of charging for the furtherance, each act in furtherance, rather than each act of execution. Thank you, Counsel. Your time has expired. All right. The case just argued will be submitted for decision.
judges: O'scannlain, Silverman, Wardlaw